**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| COACH INC. AND COACH SERVICES, INC., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Action No.  SA-10-CV-601-XR |
| SASSY COUTURE AND LYNETTE ZANARDI, | § § § § | |
| *Defendants*. | | |

**ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT**

On this date, the Court considered Plaintiffs' Motion for Summary Judgment.  (Docket No. 32).  For the reasons stated below, Plaintiffs' motion is GRANTED.

**Factual Background**

Plaintiffs Coach, Inc. And Coach Services (herinafter "Coach") filed this action against Defendants alleging, among other claims, trademark infringement.  Plaintiffs are a Maryland corporation with their principal place of business in New York, New York.  Plaintiffs are engaged in the marketing and sale of fine leather and mixed material products, including handbags, wallets, and accessories.  Plaintiffs have submitted uncontested evidence that since Coach was founded more than sixty years ago it has used a variety of legally-protected trademarks, trade dresses, and design elements/copyrights on, and in connection with, the advertisement and sale of its products.

Coach further alleges that it has invested substantial sums in promoting its products and

1

that those products are widely recognized and exclusively associated with consumers, the public, and the trade as being high quality products sourced by Coach.  Plaintiffs claim that Coach has taken steps to ensure that no other entity uses, or obtains a federal trademark registration for, a mark that is similar to the Coach trademarks.  Those steps allegedly include sending cease and desist letters, filing letters of protest with the Patent and Trademark Office objecting to the registration of similar marks, and filing lawsuits to protect the Coach trademark.

Defendants Lynette Zanardi and Sassy Couture are engaged in the promotion and sale of various fashion products, including fashion accessories.  Defendant Sassy Couture is a domestic business operating in San Antonio, Texas through the internet site www.sassyc.com, which is registered to Lynette Zanardi.  Defendants admit selling goods bearing luxury marks such as Louis Vuitton, Chanel, and Juicy Couture, without having inquired into the authenticity of those goods.  It is undisputed that on January 4, 2010, Defendants began selling products bearing trademarks that were similar or identical to Coach trademarks.  Zanardi acknowledges that she acquired inventory in various ways, including purchasing bundles of Coach branded cell phone cases through eBay.  Zanardi also acknowledges that she paid a range of costs for the items, from as high as $19.99 for a single unit to as low as $1.50 per case for multiple unit lots.  Zanardi testified that she sold the items for approximately $20.00-$30.00 each and that her intent was to double the price.  She also stated that counterfeit Coach cell phone cases were top sellers on her website.

On March 8, 2010, Defendants placed an order with a Chinese manufacturer to import two thousand cell phone cases bearing trademarks that were similar or identical in design to

Coach trademarks.  The Chinese manufacturer is not an authorized producer of products bearing the Coach trademark.  Defendants paid $1,340.00 for the order, which reflects a cost of sixty-seven (67) cents per case.  During her deposition, Zanardi did not dispute that she knew that the items would contain marks identical to or substantially similar to Coach trademarks.

Plaintiffs allege that Zanardi personally selected the counterfeit Coach designs from the manufacturer's website.  Specifically,  Plaintiffs allege that on March 5, 2010 Zanardi provided to the manufacturer the model number for cell phone cases bearing the Coach trademark and stated "I'd like to start with these.  Please send me total and how to pay."  Defendants do not dispute Plaintiffs' allegations.

United States Customs and Border Protection seized the shipment of cell phone cases bound for Sassy Couture.  U.S. Customs issued a letter to Sassy Couture on May 10, 2010 notifying Defendants that the cellphone cases had been seized on the grounds that the goods bore "counterfeits of the registered U.S. trademarks" of Coach.  Zanardi admits receipt of the letter and that the seizure occurred.

In May 2010, Zanardi contacted the shipper over the seizure of the goods and demanded a refund of the cost of the goods from the manufacturer.  Zanardi testified that the manufacturer denied responsibility and refused to refund Defendants' money, informing her that she was not authorized to use Coach trademarks.[1]  Zanardi did not petition for relief from the seizure order.

After the seizure by U.S. Customs, it is undisputed that Zanardi continued to sell items

---

[1]In her email to the shipper, Zanardi stated" "Then they [the manufacturer] asked me if I have approval from Coach to sell Coach items . . . Are you kidding?"

bearing the Coach trademark on the Sassy Couture website.  On June 15, 2010, a Coach investigator visited the website and saw listings for the sale of cell phone cases bearing Coach trademarks.  The investigator placed an order with Sassy Couture through www.sassyc.com for one of those cell phone cases at a price of $29.99, plus shipping and tax, for a total of $41.26. On July 1, 2010, the investigator received a package from Sassy Couture containing the cell phone case.  The investigator provided the cell phone case to a Coach employee trained to identify counterfeit Coach products.  That employee determined that the case was counterfeit. Defendants do not dispute those findings.

On July 16, 2010, Plaintiffs filed a lawsuit against Defendants for, among other claims, infringing Coach Trademarks.  Zanardi testified that on July 23, 2011 her ex-husband informed her of the existence of the lawsuit based on information he had seen on the internet.  Zanardi testified that she was not sure whether the information provided by him was accurate, and she continued to sell merchandise bearing the Coach trademark on her website.  On August 21, 2010, Zanardi was served with a summons and copy of the complaint.  She testified that she removed all counterfeit products from her website within a week of being formally served.

### Procedural Background

On July 16, 2010, Plaintiffs filed this action against Defendants alleging trademark and trade dress infringement, false designation of origin and false advertising, and trademark dilution under the Lanham Act; copyright infringement under the United States Copyright Act; injury to business reputation and trademark dilution under Section 16.29 of the Texas Business and Commerce Code; and trademark infringement, unfair competition and unjust enrichment

under Texas common law. (Docket No. 1).  Defendants were served with summons and a copy of the complaint on August 21, 2010. (Docket No. 12).  On October 20, 2010, Defendants filed an Original Answer.  (Docket No. 13).

On January 4, 2011, the parties filed a Joint Report on Alternative Dispute Resolution which indicated that Plaintiffs were willing to mediate, but that Defendants were unwilling to mediate due to cost concerns.  The Court located pro bono mediation services for the parties and on September 16, 2011 ordered the parties to mediate.  (Docket No. 44).  On December 6, 2011, the parties informed the Court that the case did not settle.  (Docket No. 47).

On July 11, 2011, Plaintiffs filed a Motion for Summary Judgment.  On August 23, 2011, the Defendants filed a response (docket No. 38), and Plaintiffs filed their reply on September 16, 2011 (docket No. 43).  Although the motion is styled as a motion for summary judgment, it only raises arguments for Plaintiffs' trademark infringement claims under the Lanham Act.

On December 29, 2011, Defendants' attorney filed a motion to withdraw as counsel of record.  The Court granted the motion on January 4, 2012, and Defendants are proceeding *pro se*. The case is scheduled for trial on March 26, 2012, and for pretrial conference on March 15, 2012.

### Standard of Review

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Although the evidence is viewed in the light most favorable to the nonmoving party,

a nonmovant may not rely on "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence" to create a genuine issue of material fact sufficient to survive summary judgment. *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004).

## Analysis

Plaintiffs have moved for summary judgment against Defendants Lynette Zanardi and Sassy Couture. Although the motion is styled as a motion for summary judgment, Plaintiffs only make arguments regarding the trademark infringement claims under the Lanham Act claims. Accordingly, the Court construes Plaintiffs' motion as a motion for partial summary judgment.

## I.      Liability Under the Lanham Act

Plaintiffs move for summary judgment against Defendants on the issue of liability under the Lanham Act for violations of Sections 32(1) and 43(a), respectively 15 U.S.C. §§ 1114(1) and 1125(a).[2]  In order to prove liability under the Lanham Act, Plaintiffs must "first establish

---

[2] "The Lanham Act provides separate causes of action for infringement of a registered mark and an unregistered mark." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235 n.8 (5th Cir. 2010).  Section 32 of the Lanham Act creates a cause of action for infringement of registered marks and states in relevant part:

Any person who shall, without the consent of the registrant–

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).

ownership in a legally protectable mark, and second, . . . show infringement by demonstrating a likelihood of confusion." *Am. Rice, Inc. V. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).  A cause of action for infringement exists where one "uses (1) any reproduction, counterfeit, copy[,] or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution[,] or advertising of any goods; (5) where such use is likely to cause confusion, or to cause mistake or to deceive." *Id*. (alterations in original).

### A.      Ownership of Trademark

In order to be successful in a trademark infringement suit under the Lanham Act, a

---

Section 43(a) of the Lanham Act provides a cause of action for infringement of unregistered marks and states in relevant part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

"Although the Lanham Act separately establishes these causes of action, '[t]he same tests apply to both trademarks and trade dress to determine whether they are protectible and whether they have been infringed, regardless of whether they are registered or unregistered.'" *Amazing Spaces*, 608 F.3d at 235 n.8 (quoting *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998)).

plaintiff must first establish ownership of a legally protected mark.  Except in certain limited

circumstances, ownership of a protectable mark is proven where a mark is federally registered

and has become "incontestable" under §§ 1058 and 1065.  *Westchester Media v. PRL USA*

*Holdings, Inc.,* 214 F.3d 658, 669 (5th Cir. 2000).  If a mark is not registered, or if it registered

but has not achieved incontesability, validity depends on proof of a secondary meaning, unless

the mark is inherently distinctive.[3] *See Amazing Spaces*, 608 F.3d at 235-240.

Here, Plaintiffs have produced uncontested evidence that the trademarks at issue are

registered with the United States Patent and Trademark Office.[4]  According to the evidence

presented by Plaintiffs, all but one of those trademarks have been in continuous use for more

than five (5) years and are still in use in commerce, and are therefore incontestable under

Sections 8 and 15 of the Lanham Act, 15 U.S.C. §§ 1058 and 1065.[5]

---

[3]As explained by the United States Supreme Court:

[A] mark can be distinctive in one of two ways.  First, a mark is inherently distinctive if
its intrinsic nature serves to identify a particular source. . . . Second, a mark has acquired
distinctiveness, even if it is not inherently distinctive, if it has developed a secondary
meaning, which occurs when, in the minds of the public, the primary significance of a
mark is to identify the source of the product rather than the product itself.

*Wal-Mart Stores, Inc. v. Samara Bros*., Inc., 529 U.S. 205, 210-11 (2000) (citations, alterations,
and quotation marks omitted).  The Fifth Circuit has also noted that registration of a trademark
creates a presumption of validity that may be rebutted with evidence that the mark is not
inherently distinct.  *Amazing Spaces*, 608 F.3d at 237.

[4]Specifically, Coach owns the trademark registrations for "COACH LEATHERWARE
EST. 1941 [Heritage Logo]," registration number 3,441,671; "COACH" name, registration
number 2,088,706; "CC & DESIGN (Signature C), registration number 2,832,589; and "COACH
& LOZENGE DESIGN," registration number 2,045,676.

[5]Coach indicated in its Motion and in various affidavits that all of the trademarks at issue
in this case have been registered for more than five (5) years.  However it appears that the

8

Plaintiffs further allege that Coach goods have become among the most popular in the world, and that products bearing their trademark are widely recognized and exclusively associated by the public as being high quality products produced by Plaintiffs, and that this has resulted in Plaintiffs' trademarks having a secondary meaning and exclusive goodwill. Defendants do not dispute this contention, nor have they produced any evidence to challenge it. *See id.* at 238-244. Accordingly, there is no issue of fact regarding Plaintiffs' legally protected ownership of the trademarks at issue.

### B. Use of the Marks

Next, Plaintiffs must establish that Defendants used Coach trademarks in commerce without authorization. "The term use in commerce means the bona fide use of a mark in the ordinary course of trade [such as] in connection with the sale, offering for sale, or advertising [of goods]." 15 U.S.C. § 1127.

Here, Defendants do not contest use of Coach trademarks. It is undisputed that Defendants sold to a Coach investigator a cell phone case bearing counterfeit trademarks of the COACH word mark, the CC & DESIGN (Signature C), and the COACH LEATHERWARE EST. 1941 mark. In addition, Plaintiffs have provided screenshots from the Sassy Couture website offering for sale another cell phone case bearing logos identical to or substantially similar to Coach's CC & DESIGN and COACH & LOZENGE DESIGN marks. Defendants have not disputed Plaintiffs' evidence.

─────────────────────

"COACH LEATHERWARE EST. 1941 [Heritage Logo]" trademark was not registered until June 3, 2008.

9

It is also uncontested that the counterfeit trademarks were used in commerce without Coach's authorization on goods sold or offered for sale. Defendants admit selling products bearing Coach trademarks over the internet. Further, Defendants do not dispute that they are not and have never have been authorized to sell Coach products. Thus, there are no material facts in dispute regarding whether Defendants used Coach's trademarks, without authorization, on goods sold or offered for sale.

### C.    Likelihood of Confusion

The gravamen of an infringement claim under the Lanham Act is the likelihood of confusion. *See Scott Fetzer Co. v. House of Vacuums Inc*., 381 F.3d 477, 483 (5th Cir. 2004) ("To prove trademark infringement and unfair competition under federal law, Scott Fetzer must show that the use of the KIRBY mark by House of Vacuums is likely to cause confusion among consumers as to the source, affiliation, or sponsorship of House of Vacuums's products or services."); *Int'l Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr*., 103 F.3d 196, 200 (1st Cir. 1996) ("[L]ikelihood of confusion often is the dispositive inquiry in a Lanham Act case."). The Fifth Circuit has identified several factors, known as the digits of confusion, to determine whether there is a likelihood of confusion: "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers. The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported even by a majority of the . . . factors." *Scott Fetzer Co.*, 381

F.3d at 484-85 (internal quotations omitted).

Some courts have concluded that "in the case of a counterfeit mark, likelihood of confusion is clear" and as a result the digits of confusion analysis is unnecessary. *Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F. Supp. 2d 995, 1007 n.11 (S.D. Texas. 2000); *see also Paulsson Geophysical Servs. v. Sigmar*, 529 F.3d 303, 310-311 (5th Cir. 2008) (noting that analysis of the digits of confusion is "inapplicable to the facts of [a] case where the [Defendant] used the exact same mark"); *Microsoft Corp. v. CMOS Techs., Inc.*, 872 F. Supp. 1329, 1335 (D.N.J. 1994) ("It would be difficult to imagine a clearer case of consumer confusion than the instant case in which the defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's registered marks appear in their entirety.  Under these circumstances, the likelihood of consumer confusion, mistake, or deception is clear."). However, this Court need not determine whether such a presumption exists because, as explained below, application of the digits of confusion test demonstrates that there is no factual dispute regarding likelihood of confusion in this case.

### 1.     Type of Mark Allegedly Infringed

The first factor the Court must consider is the type of mark allegedly infringed.  "This factor refers to the strength of the mark: the stronger the mark, the greater the protection." *Taylor Made Golf Co. V. MJT Consulting Grp., LLC*, 265 F. Supp. 2d 732, 743 (N.D. Tex. 2003).

As noted above, Plaintiffs' trademarks have been registered with the United States Patent and Trademark Office.  Moreover, Plaintiffs allege that products bearing the Coach

trademark are widely recognized and exclusively associated by the public as being high quality products produced by Coach.  Defendants do not dispute these allegations.  Accordingly, the undisputed facts regarding this factor weigh heavily in Plaintiffs' favor.

### 2.      Similarity Between the Marks

Second, the Court looks at the similarity between the marks.  In determining the similarity of the marks, the Court must consider "the commercial impression created by the mark as a whole." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 261 (5th Cir.1980) (citation omitted).  "The relevant inquiry is whether, under the circumstances of the use, 'the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated.'" *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1999) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 21 cmt. c (1995)).

There is no serious challenge regarding this factor. The goods sold by Defendants bear marks that are similar or identical to Coach trademarks.  It would be natural for consumers encountering Defendants' products to assume that they were made by Plaintiffs.  The undisputed facts therefore weigh in Plaintiffs' favor.

### 3.      Similarity Between Products

Next the Court looks at the similarity between the parties' products.  "The greater the similarity between the products and services, the greater the likelihood of confusion." *American Century Propriety Holding v. American Century Casualty Company*, 295 Fed. Appx. 630 (5th Cir. 2008) (unpublished opinion) (quoting Tex. Motor Exch., 628 F.2d 500, 505 (5th Cir. 1980)).  However, actual similarity is not required and "[c]onfusion can arise from a perceived

affiliation between the two parties under the circumstances." *Id.*

The items sold by Defendants are counterfeit products carrying logos bearing Coach's name.  In addition, Plaintiffs allege that the Defendants' products are "studied imitations" of authentic Coach products and are similar in overall appearance and design.  Defendants do not dispute these allegations.  Accordingly, this factor weighs in Plaintiffs' favor.

### 4.    Identity of Retailers and Purchasers

The fourth factor in the digits of confusion test is the identity of retailers and purchasers.  Similarities between retail outlets and the predominant customers of a plaintiff and defendant's respective products increases the possibility of confusion, mistake or deception.  *See, e.g., Amstar Corp.*, 615 F.2d at 262.

It is undisputed that Defendants targeted the same market as Coach- the consuming public. *See MetroPCS Wireless, Inc. v. Virgin Mobile USA, L.P.*, Civ. Action No. 3:08-CV-1658-D, 2009 U.S. Dist. LEXIS 88527 (N.D. Tex. Sept. 25, 2009).  Moreover, Zanardi testified that Coach cell phone cases were top sellers on her website, indicating that there may be an identity with customers.  Thus, the undisputed facts regarding this factor weigh in Plaintiffs' favor.

### 5.    Similarity of Advertising Channels

The fifth factor is the similarity of advertising channels.  "[A]dvertising in similar media [is] an indication that consumers might be confused as to the source of similar products." *American Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 323 (5th Cir. 2008).  Generally, "the greater the degree of overlap in the marketing approaches of the two entities, the greater

13

the likelihood of confusion." *American Century*, 295 Fed. Appx. at 638.

It is undisputed that Defendants marketed products substantially similar to Plaintiffs in a similar venue as Plaintiffs– the internet.  However, Coach only markets its products on its official website, minimizing the impact of this factor.  Thus, this factor does not weigh heavily in either parties' favor.

### 6.    Intent of Defendants

The Court next examines whether Defendants' conduct was intentional.  "Proof of the defendant's intent to benefit from the good reputation of the plaintiff's products is not required in order to establish infringement."  *American Rice*, 518 F.3d at 332.  However, if intent can be shown, "it may provide compelling evidence of a likelihood of confusion." *Id*.  Indeed, the Fifth Circuit has concluded that "if the mark was adopted with the intent of deriving benefit from the reputation of (the plaintiff), that fact alone may be sufficient to justify the inference that there is confusing similarity." *Id*.

Zanardi admitted during her deposition that she was familiar with Coach trademarks before she began selling the counterfeit Coach items on the Sassy Couture website.  She further admitted that she knew and understood that she did not have a right to sell products bearing the Coach trademarks.  In addition, she testified that she never sought a legal opinion before selling the counterfeit products.

Zanardi's intent can further be inferred from the method used to obtain the counterfeit products.  Plaintiffs allege that Zanardi purchased counterfeit Coach items on eBay at a range of costs per item, from a high of $19.99 for a single unit to as low as $1.50 per case when

14

purchased in multiple unit lots of ten.  Zanardi testified that she sold the items for between $20.00 to $30.00 and that her intention was to double the price.  On March 8, 2010, Defendants purchased two thousand cell phone cases with unauthorized Coach designs from a manufacturer in China.  Defendants paid $1,340.00 for the order, which reflects a cost of sixty-seven (67) cents per case.  Zanardi acknowledges that the items purchased would contain marks identical to or substantially indistinguishable from Coach trademarks.  Finally, Zanardi has admitted that the counterfeit Coach items were best sellers on her website.

United States Customs and Border Protection seized the shipment and informed Defendants of the seizure in a letter dated May 10, 2010 that the items had been seized on the ground that they were counterfeit.  Zanardi admits that she received the letter.  In response, Zanardi contacted the manufacturer in China and demanded a refund of the costs of the goods. The manufacturer refused, informing Zanardi that she did not have a right to use the Coach trademark.  Zanardi did not attempt to recover the items from Customs.  It is undisputed that even after being informed by U.S. Customs that the items from China were counterfeit, Zanardi continued to sell products on the Sassy Couture website bearing Coach trademarks without any inquiry into their authenticity.[6]

The fact that Zanardi admitted being aware of the Coach brand prior to selling the items,

---

[6]During her deposition, Zanardi testified:

Q.    After receiving notice from Customs, did you take any steps to determine whether the products you were selling on your website were authentic?

A.    No.

15

failed to engage in any kind of investigation regarding the authenticity of the items she was selling on her website, and the fact that the items were bestsellers, evidences an intent to benefit from the goodwill of the Coach name.  The undisputed facts regarding this factor weigh heavily in favor of Plaintiffs.

### 7.      Actual Confusion and Degree of Care Exercised by Potential Purchasers

The final two factors the Court examines is whether there was actual confusion by consumers and the degree of care exercised by potential purchasers.  "Evidence that consumers have been actually confused in identifying the defendant's use of a mark as that of the plaintiff may be the best evidence of a likelihood of confusion."  *Bd. Of Supervisors*, 550 F.3d at 483. However, it is well established that "evidence of actual confusion is not necessary for a finding of likelihood of confusion."  *Id*.  Additionally, "confusion is more likely [] if the products in question are 'impulse' items or are inexpensive." *Blue Bell Bio-Medical v. Cin-Bad, Inc*., 864 F.2d 1253, 1260 (5th Cir. 1989).

Here, neither party has put forward any evidence regarding actual confusion by consumers or the degree of care exercised by potential purchasers.  These factors do not weigh in either party's favor.

### 8.      Weighing the Digits of Confusion

In sum, the record does not contain any evidence that creates a genuine issue of material fact regarding the likelihood of confusion.  The undisputed facts weigh in Plaintiffs' favor such that a reasonable fact finder would have to find that Plaintiffs demonstrated a likelihood of confusion as to the source, affiliation, or sponsorship of Defendants' products.

**D.    Defenses**

Defendants argue that their actions did not constitute direct infringement because their use of Plaintiffs' trademark is protected by the nominative fair use doctrine.[7]  "The nominative fair use doctrine provides that 'one who has lawfully copied another's product can tell the public what he has copied.'" *Bd. of Supervisors for La. State Univ. Agric. & Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 488 (5th Cir. 2008).  "It also permits one to 'use another's mark truthfully to identify another's goods or services in order to describe or compare its product to the markholder's product.'" *Id*.  However, the right of fair use is a limited one and "the use cannot be one that creates a likelihood of confusion as to source, sponsorship, affiliation, or approval." *Id*.

Defendants cite *Tiffany Inc. v. eBay*, 600 F.3d 93 (2d Cir. 2010), a trademark infringement case involving counterfeit products sold on an online auction website by third parties.  In *Tiffany*, the plaintiff alleged that eBay committed direct trademark infringement by directing consumers to Tiffany products sold on its website, when some third party sales involved counterfeit Tiffany jewelry. *Id*. at 97.  The Second Circuit concluded that eBay did not commit direct infringement because its use of the "Tiffany" trademark accurately described the availability of authentic Tiffany goods on eBay.  The Court further concluded that in its use of the trademark eBay did not reference any particular "Tiffany" offerings and that their use of the

---

[7]Defendants also claim that they are not contributorily liable for trademark infringement. However, Plaintiffs have not made an allegation of contributory infringement.  Moreover, the doctrine is inapplicable because there is no third party alleged to have been induced by Defendants to infringe the Coach trademark.  *See Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982).

mark did not suggest any false affiliation or endorsement by the plaintiff.  The court therefore concluded that eBay's use of the mark was nominative fair use and did not constitute direct infringement.

The Court finds the present case distinguishable from *Tiffany*.  Unlike *Tiffany*, Defendants are not using the Coach trademark to describe the general availability of authentic goods for sale on their website.  Rather Defendants used the Coach trademark for the sale of counterfeit Coach products.  Moreover, while eBay merely provided an online center for auctions, Defendants sold their products directly to consumers.  Defendants actions therefore created "a likelihood of confusion as to source, sponsorship, affiliation, or approval." *Bd. of Supervisors for La. State Univ. Agric. & Mech. College*, 550 F.3d at 488.

Thus, the Court concludes that the Plaintiffs are entitled to partial summary judgment on their claims under Sections 32(1) and 43(a) of the Lanham Act.  The Court now turns to the question of remedies.

## II.    Remedies

### A.    Individual Liability

Plaintiffs argue that Lynette Zanardi should be held individually liable for trademark infringement.  The Fifth Circuit has found that "a trademark, like a patent, can be infringed by an individual." *Mead Johnson & Co. v. Baby's Formula Service, Inc.*, 402 F.2d 19, 23 (5th Cir. 1968).  "It is infringed when an individual performs the act or does the things that the patent or trademark law protects against. The fact that the persons thus acting are acting for a corporation also, of course, may make the corporation liable under the doctrine of respondeat superior. It

does not relieve the individuals of their responsibility." *Id*.  Thus, "[a]n individual can be held personally liable if he 'actively and knowingly caused the infringement.'" *Taylor Made Golf Co. v. MJT Consulting Group*, 265 F. Supp. 2d at 746.

The Court finds that Zanardi is liable in her individual capacity.  Zanardi is the sole owner of Sassy Couture and personally selected the counterfeit products for sale.  Zanardi also personally sold the counterfeit items, shipped them to consumers, and answered questions from potential buyers.  She was therefore the "moving, active, and conscious force" behind the infringement. *See, e.g. Babbit Elecs, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1984).

### B.      Intentional and Willful Conduct

Plaintiffs next argue that Defendants' conduct was intentional and willful and that this should be taken into account in considering the amount of damages.  A defendant acts willfully "'if he knows his actions constitute an infringement.'" *Taylor Made Golf Co.*, 265 F. Supp. 2d at 748 (quoting *Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 236 (5th Cir. 1988)).  Several circuit courts of appeal and districts courts have also found intent where a defendant acts with "'reckless disregard for, or [with] willful blindness'" toward a trademark owner's rights. *Philip Morris USA Inc. v. Lee*, 547 F. Supp. 2d 685, 693 (W.D. Tex. 2008).

Courts have considered a number of factors when determining whether a defendant intentionally violated the Lanham Act, including: (1) whether a purchase price fell far below market value, *Microsoft*, 129 F. Supp. 2d at 1008; (2) whether a defendant continued to sell counterfeit items after receiving notice that similar items were seized by United States Customs,

*Philip Morris USA Inc. v. Banh et al.*, No. CV 03-4043, 2005 U.S. Dist. LEXIS 43113, at *7 (C.D. Cal. Jan. 14, 2005); (3) the quantity of the counterfeit goods purchased, *Philip Morris USA Inc. v. Lee*, 547 F. Supp. 2d at 693; and (4) whether the defendant attempted to verify the authenticity of the goods, *id.*

The undisputed facts in this case demonstrate that Defendants intentionally violated the Lanham Act. Defendants sold items bearing counterfeit Coach trademarks on the Sassy Couture website, along with other goods bearing luxury marks such as Louis Vuitton, Chanel, and Juicy Couture, without any effort to verify the authenticity of the products. Zanardi testified that she was familiar with the Coach brand and the Coach Signature C trademark before she began her online business. She also acknowledges that she has never been licensed to sell Coach products, and yet she also admits making intentional efforts to acquire items with the Coach trademark to sell on the Sassy Couture website.

Zanardi's method of acquiring products provides further evidence of her willfulness. Zanardi purchased items on eBay at costs ranging from a high of $19.99 for a single unit to as low as $1.50 per case when purchased in multiple unit lots of ten. Zanardi also attempted to import two thousand counterfeit cell phone cases from China paying $1,340.00 for the order, which reflects a cost of sixty-seven (67) cents per case. Despite these extremely low prices, Zanardi never inquired into whether the eBay or Chinese suppliers were selling authentic goods or were otherwise authorized to distribute Coach products for retail sale.

In addition, Defendants continued to sell products bearing the Coach trademark after being placed on notice that similar items were counterfeit and that Defendants did not have a

right to use the Coach trademark.  After being informed by U.S. Customs that Coach-branded items she ordered from China were counterfeit, Zanardi contacted the manufacturer in China and demanded a refund of the costs of the goods.  The manufacturer refused, informing Zanardi that she did not a right to use the Coach trademark.  It is further undisputed that Defendants continued selling counterfeit Coach products after the U.S. Customs seizure.  Thus, despite being on notice that similar items she ordered were counterfeit, and that she was not authorized to sell the Coach trademark, Zanardi continued to sell counterfeit Coach items on the Sassy Couture website without inquiring into the items' authenticity.

In sum, Defendants' actions evidence an intent to violate the Lanham Act: (1) Defendants bought items, at times in high volume, at prices far below market value; (2) Defendants continued to sell counterfeit Coach items after being informed that similar items were seized by U.S. Customs for being counterfeit; and (3) Defendants made no attempt to verify the authenticity of the goods for sale on the Sassy Couture website, even after being put on notice that the items ordered from China were counterfeit.  Viewing the facts in total, the Court concludes that Defendants acted with the intent to violate the Lanham Act.

### C.    Amount of Damages

The Lanham Act authorizes plaintiffs in counterfeit mark cases to recover statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of good . . . as the court considers just" or "if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods." 15 U.S.C. § 1117(c). The trial court has broad discretion in setting the amount of statutory damages. *Microsoft Corp.*

21

*v. Software Club, Inc.*, 129 F. Supp. 2d 995, 1011 n.17 (S.D. Tex. 2000).

As guidance, many courts consider the following factors for the award of statutory damages under an analogous provision of the Copyright Act: (1) "the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant." *John Wiley & Sons, Inc., et al. v. Kanzin Rukiz Entertainment and Promotions et al.*, No. 06 Civ. 12949, 2007 U.S. Dist. LEXIS 42095 at *6 (S.D.N.Y. June 12, 2007) (Gorenstein, M.J.) (collecting cases) (internal quotation marks and citations omitted).

Plaintiff seeks $100,000 in damages per mark infringed, for total damages of $400,000. The Court believes that this amount is excessive.  Although the Court concluded that Defendants' actions were willful, additional factors weigh against such a significant award. First, Defendants' profits were extremely limited– Coach estimates that Defendants' profits span $1,786.19 to $4,682.34. *See Microsoft Corp.*, 129 F. Supp. at 1010-11.  In addition, Defendants removed the counterfeit products from the Sassy Couture website upon receiving formal notice of the above-captioned lawsuit. *See Taylor*, 265 F. Supp. 2d at 749.  Finally, Plaintiffs' investigation into Defendants' infringement was limited– Plaintiffs' investigator visited Defendants' website once and only ordered a single item. *See Coach, Inc. v. Linda's Accesorios Y Cellulares*, Civ. Action No. 3:11-CV-0496-L, 2011 U.S. Dist. LEXIS 71351, at *2-4 (N.D. Tex. June 30, 2011).

While an award of $100,000 per mark is excessive, Defendant's intentional conduct and the number of items allegedly bought and sold justifies an award above the statutory minimum. The Court concludes that an award of $15,000 per mark would compensate Plaintiffs for the infringing conduct.  Accordingly, the Court finds that Plaintiffs are entitled to an award of $60,000.

### D.      Permanent Injunction

Plaintiffs next request a permanent injunction enjoining Defendants "from any future use of the Coach Trademarks."  The Lanham Act provides that "courts vested with jurisdiction of civil actions arising under this Act shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark . . . ."  15 U.S.C. § 1116(a).

In order to receive an injunction, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).   Furthermore, a party seeking permanent injunction in a trademark infringement case must show (1) that the mark is protectable; (2) the party is a senior user; and (3) there is a likelihood of confusion between the two marks that (4) will actually result in irreparable injury for which there is no adequate legal remedy. *Union Nat'l Bank v. Union Nat'l Bank*, 909 F.2d 839, 844 (5th Cir. 1990).

23

With regard to the requirements for receiving an injunction in a trademark infringement case, Plaintiffs have established the first and second requirements as described earlier in this opinion.  In addition, Coach is clearly the senior user having used the registered trademarks for decades before Defendants began selling counterfeit Coach products in January, 2010.

Regarding the remaining requirements, the Court concludes that Plaintiffs have suffered and could again suffer an irreparable injury resulting from confusion between authentic Coach products and Defendants' counterfeit products.[8]  The counterfeit products were of inferior quality and were injected into the marketplace in order to capitalize on Coach's goodwill and reputation.  The likely confusion between Defendants' counterfeit products and authentic Coach products harms Coach's reputation and undermines Coach's financial investment in its higher quality products, as well as the value of its marks.  Moreover, there is no adequate legal remedy because the damage to Plaintiffs' goodwill and reputation cannot be easily quantified. *See Mary Kay, Inc. v. Weber*, 661 F. Supp. 2d 632, 640 (N.D. Tex. 2009).

In addition, considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted.  As already noted, Plaintiffs will suffer irreparable harm if Defendants once again begin selling counterfeit Coach products.  On the other hand, a

---

[8]Although the Fifth Circuit has declined to adopt a presumption of irreparable harm in trademark infringement cases, some courts in this circuit have concluded that "[w]hen a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury, regardless of the actual quality of those goods or services." *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 831 (S.D. Tex. 1999).  Although Plaintiffs make this argument, the Court need not decide this issue because in this case Plaintiffs have demonstrated a substantial threat of irreparable injury.

permanent injunction only requires Defendants to bring their business into compliance with federal law. *See id.* Thus, this factor weighs in favor of entry of an injunction.

Finally, a permanent injunction serves the public interest. The Lanham Act exists "to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985). Defendants' actions jeopardized consumers' ability to distinguish between authentic Coach items and counterfeit items, and a permanent injunction therefore protects the consuming public as well as Plaintiffs.

The Court now turns to the question of the appropriate scope of the injunction. "[T]he scope of injunctive relief is dictated by the extent of the violation established. . . . The district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004) (internal quotations and citations omitted).

Keeping this standard in mind the Court ORDERS that Defendants, their officers, agents, servants, employees, and any other persons in active concert or participation with them are permanently enjoined:

> 1. from manufacturing, procuring, distributing, shipping, retailing, selling, advertising or trafficking, any merchandise, including cellphone cases, handbags, wallets, apparel, sunglasses, jewelry and/or related merchandise, not authorized by Coach, bearing unauthorized simulations, reproductions, counterfeits, copies or colorable imitations of Coach' Trademarks, or bearing a design or image which is of a substantially similar in appearance to those listed in the Original Complaint and in the Declaration of Tiffany Walden;

> 2. from passing off, inducing or enabling others to sell or pass off, as authentic products produced by Coach or otherwise authorized by Coach, any product not manufactured by Coach or produced under the control or supervision of Coach and approved by Coach, which utilize any of the Coach Trademarks listed in the Original Complaint and in the

Declaration of Tiffany Walden;

3. from committing any act calculated to cause purchasers to believe that the Defendants' products are those sold under the control and supervision of Coach, or are sponsored, approved or guaranteed by Coach, or are connected with and produced under the control or supervision of Coach;

4. from further diluting and infringing the Coach Trademarks and damaging their goodwill;

5. from engaging in any other activity constituting unfair competition with Coach or that will cause the distinctiveness of the Coach Trademarks to be diluted; and

6. from causing, aiding, and/or abetting any other person from doing any act proscribed under (1) through (4) above.

**E.     Costs**

Plaintiffs seek costs in the amount of $2,934.90.  Under the Lanham Act a prevailing plaintiff is entitled to recover "the costs of the action."  15 USCS § 1117(a).  The term "costs of the action" is not defined. *See People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370 (4th Cir. 2001).  However, courts have found that "costs" under § 1117(a) include, at a minimum, those costs specifically enumerated in 28 U.S.C. § 1920.

Plaintiffs attached a bill of costs to its Motion for Summary Judgment.  Upon reviewing the Bill of Costs, the Court concludes that Plaintiffs request costs beyond those allowed under § 1920, including service of process fees above those charged by the Marshal and color copies of the deposition of Lynette Zanardi.  In addition, the Bill of Costs fails to adequately explain those costs that are allowable under § 1920, including costs for a failed attempt to serve Defendants, costs for copies (which must be demonstrated to have been "necessarily obtained for use in the case"), and costs incurred by Fish & Richardson, LLP.

26

Accordingly, if Plaintiffs wish to pursue costs, Plaintiffs shall file an amended Bill of Costs in the form prescribed by the Clerk within fourteen days of the issuance of a final judgment in this case. In its amended Bill of Costs, Plaintiffs must adequately explain all fees sought under § 1920 and, for any costs sought that are beyond those allowed under § 1920, provide an explanation for why the Court should exercise its discretion to award those costs.

### F.      Attorney Fees

Plaintiffs seek attorney's fees in the amount of $52,490.50. "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). An "exceptional case is one in which the defendant's trademark infringement can be characterized as malicious, fraudulent, deliberate, or willful[.]" *Martin's Herend Imports v. Diamond & Gem Trading USA*, 112 F.3d 1296, 1305 (5th Cir. 1997). Based upon the above finding that Defendants' conduct was willful and intentional, the Court concludes that attorney fees are appropriate in this case.

If Plaintiffs wish to pursue attorney fees, Plaintiffs shall file an application for attorney fees in the manner provided under the Local Rules within fourteen days of the issuance of a final judgment. Because the Court finds that attorney's fees are justified pursuant to the Lanham Act, the Court waives the requirement under Local Rule 7 that Plaintiffs confer with Defendants prior to submitting the application.

### Conclusion

The Court finds that Defendants Lynette Zanardi and Sassy Couture have failed to raise a material fact issue sufficient to defeat Plaintiffs' motion for partial summary judgment.

Accordingly, Plaintiffs' motion (docket no. 32) is GRANTED.  Plaintiffs are ORDERED to inform the Court within fifteen days of the issuance of this Order if they intend to proceed on their remaining claims.

It is so ORDERED.

SIGNED this 19th day of January, 2012.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE